# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN COTTILLION, *et al.*, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

v.

UNITED REFINING COMPANY, *et al.*,

        Defendants.

C.A. No. 09-140 Erie
District Judge McLaughlin

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

On June 12, 2009, Plaintiffs John Cottillion and Beverly Eldridge filed this putative class action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against United Refining Company, the United Refining Company Salaried Employees Pension Plan, and the Retirement Committee responsible for administering the Plan. On October 26, 2009, Plaintiffs filed an amended complaint wherein they assert (1) a claim for benefits pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), (2) a claim for declaratory relief pursuant to ERISA §§502(a)(1)(B), 502(a)(3), 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3), (3) breach of fiduciary duty pursuant to ERISA § 404, 29 U.S.C. § 1104, and (4) a violation of ERISA's anti-cutback provision, §204(g), 29 U.S.C. §1054(g)(2). Now pending before the Court are Plaintiffs' Motion for

Summary Judgment on Counts I, II and IV [Dkt. 138], Defendants' Motion for Summary Judgment [Dkt. 153], and Plaintiffs' Motion to Strike Expert Reports and Testimony [Dkt. 167].  Each of these motions is fully briefed and ripe for review.

## I.  <u>Background</u>

The following facts are undisputed, unless otherwise noted.  Plaintiff John Cottillion ("Cottillion") was employed by the United Refining Company ("United Refining") from December 27, 1960 to April 21, 1989.  (Pl. Ex. 1, Answer, ¶ 32; Pl. Ex. 2, Kaemmerer Decl., ¶ 4).[1]  Plaintiff Beverly Eldridge was employed by United Refining from July 20, 1987 to December 6, 1996.  (Pl. Ex. 1, Answer, ¶ 51; Pl. Ex. 2, Kaemmerer Decl., ¶ 3; Defendant's Response to Concise Statement, ¶ 3).  Both Cottillion and Eldridge participated in the United Refining Pension Plan for Salaried Employees ("the Plan"), a pension plan sponsored and funded exclusively by United Refining for its employees.  (Pl. Ex. 1, Answer, ¶¶ 1, 32).  Because Cottillion and Eldridge each ended their employment with United Refining after satisfying the Plan's vesting requirement, but prior to the "Early Retirement Date" specified by the Plan, they fall into a category referred to as "terminated vested participants."

---

[1] Citations to "Pl. Ex." refer to the exhibits contained in Plaintiffs' Appendix in Support of Summary Judgment. Defendant's exhibits are cited herein as "Def. Ex."

The "Named Fiduciary" and "Administrator" of the Plan is the United Refining Company Retirement Committee ("Retirement Committee"). (Pl. Ex. 4, 1980 Plan Document § 13.01; Pl. Ex. 6, 1987 Plan Document § 14.01; Pl. Ex. 7, 1995 Plan Document § 7.1; Pl. Ex. 8, 2002 Plan Document § 7.1). From May 3, 1988 to January 1, 2009, the Retirement Committee consisted of Lawrence Loughlin, Myron Turfitt, and John Catsimatidis, with Loughlin, the Secretary of the Retirement Committee, serving as the Plan's day-to-day administrator. (Pl. Ex. 9; Pl. Ex. 10, Loughlin Decl., ¶ 2; Pl. Ex. 4, 1980 Plan § 13.01; Pl. Ex. 6, 1987 Plan, § 14.01; Pl. Ex. 7, 1995 Plan § 7.1).

At the time of Cottillion's retirement, the Plan was governed by a document styled "United Refining Company Pension Plan for Salaried Employees as Amended and Restated Effective June 30, 1980 (the "1980 Plan Document"). (Pl. Ex. 4, 1980 Plan Document). Section 4.01 of the 1980 Plan Document defined a participant's "Normal Retirement Date" as "the first day of the month coincident with, or next following his 65th birthday." Section 4.02 defined a participant's "Early Retirement Date" as "the first day of the month coincident with or following his 60th birthday and his completion of 10 years of Vesting Service, provided that he informs the Committee at least three months prior to such Early Retirement Date of his intention to retire early."

Article VII of the 1980 Plan Document addressed termination from employment. Specifically, Section 7.01 provided that "[i]f a participant's

employment shall terminate prior to his Normal Retirement Date or an Early Retirement Date, for any reason other than death, he shall be entitled to a deferred vested Retirement Income if he is credited with at least ten (10) years of Vesting Service at the time of his employment termination." (Pl. Ex. 4, 1980 Plan Document, § 7.01). Section 7.02 provided that "[t]he amount and time of commencement of a deferred vested Retirement Income to a participant who satisfies the requirements of Section 7.01 shall be determined in accordance with the provisions of Section 5.03, based on the Participant's Benefit Service and Average Compensation at the time of employment termination." The cross-referenced section, Section 5.03, stated:

> A Participant who retires on an Early Retirement Date may elect to receive one of the following:
>
> (a)  His Accrued Retirement Income computed as of his Early Retirement Date commencing at the end of the month in which his Normal Retirement Date would have occurred.
> (b)  A reduced amount of Retirement Income to begin at the end of the month in which his Early Retirement Date occurs, computed so as to be a percentage of the benefit provided for him under paragraph (a) of this Section 5.03, in accordance with the following table. . .

(Section 5.03). The table accompanying Section 5.03 specified a "100.0%" benefit for retirees who started collecting benefits zero, one, two or three years prior to their Normal Retirement Date, a "93.3%" benefit for participants four years prior to Normal Retirement Date, and an "86.7%" benefit for participants

five years prior to Normal Retirement Date.  (Id.)  Consistent with this language, letters sent from United Refining to terminated vested participants during this time period informed them that any reduction in expected benefits prior to the participant's Normal Retirement Date "appl[y] to ages 60 and 61 only."

Effective July 1, 1987, United Refining adopted "Amendment No. 5" which amended the 1980 Plan Document by, *inter alia*, reducing the Vesting Service requirement for a terminated vested participant to five years and amended Section 5.03 to read: "A participant who retires on an Early Retirement Date will receive his Accrued Retirement Income computed as of his Early Retirement Date commencing at the end of the month in which his Early Retirement Date occurs."  (Pl. Ex. 5, Amendment No. 5 to 1980 Plan Document, ¶ 4).  Following the adoption of Amendment No. 5, United Refining communicated with terminated vested participants to inform them that they could elect to have their full retirement benefit begin without reduction at any time after their Early Retirement Date.  (Pl. Ex. 24, 5/13/88 Letter to Frederick Hane).  Consequently, when Cottillion terminated his employment with United Refining in 1989, the company sent him a letter informing him that he could elect to receive his full retirement benefit - $573.70 – following his Early Retirement Date in October, 1995, "at age 60."  (Pl. Ex. 25, 8/7/89 Letter to Cottillion; Pl. Ex. 26, Cottillion Application for Benefits).  From November, 1995 through June, 2006, Cottillion received his full monthly benefit each month without any actuarial reduction for

early retirement. (Pl. Ex. 14, Cottillion Depo., pp. 117-118; Pl. Ex. 46, 6/15/06 Letter to Cottillion).

On December 28, 1994, United Refining adopted a restated plan document, effective January 1, 1987, entitled "United Refining Company Pension Plan for Salaried Employees as Amended and Restated Effective January 1, 1987" (the "1987 Plan Document"). (Pl. Ex. 6, 1987 Plan Document). The 1987 Plan Document provided that, "[i]f a Participant's employment shall terminate prior to his Normal Retirement Date for any reason other than death, he shall be entitled to a deferred vested Retirement Income if he is credited with at least five (5) years of Vesting Service at the time of his employment termination." (Pl. Ex. 6, 1987 Plan Document, § 7.01). Section 7.02 of the 1987 Plan Document stated:

> The amount of a deferred vested Retirement Income to a Participant who satisfies the requirements of Section 7.01 shall be determined in accordance with Section 5.03, based on the Participant's Benefit Service and Average Compensation at the time of employment termination. The form and payment of a Participant's deferred vested retirement income shall be determined and made in accordance with the provisions of Article VI as though such terminated Participant had remained in the employment of the Company until reaching his Normal Retirement Date.

(Pl. Ex. 6, 1987 Plan Document, § 7.02). Section 5.03 of the 1987 Plan Document continued to provide that "A Participant who retires on an Early Retirement Date will receive his Accrued Retirement Income computed as of his

Early Retirement Date commencing at the end of the month in which his Early Retirement Date occurs."  Consequently, when Eldridge terminated her employment with United Refining on December 6, 1996, she was informed that she could elect to have her "vested benefits . . . paid monthly commencing on the first of the month following [her] 59 1/2 birthday December 2009, without any reduction for early retirement."  (Pl. Ex. 37, Eldridge Application for Benefits; Pl. Ex. 38, 1/8/97 Letter to Eldridge).[2]

On January 30, 2002, United Refining resolved to amend and restate the Plan in order to comply with the requirements of various recent legislative enactments.  (Pl. Ex. 39, Consent of Directors).  An amended and restated plan document, referred to as the "1995 Plan Document," was executed on January 30, 2002.  (Pl. Ex. 7, 1995 Plan Document).  Following notification from the IRS that several amendments to the Plan Document were required before a favorable determination letter could be issued, another amended and restated plan document, the "2002 Plan Document," was adopted on March 18, 2003.  (Pl. Ex. 8, 2002 Plan Document; Pl. Ex. 20, IRS Submission).

Both the 1995 and 2002 Plan Documents added the following language in Section 5.4(c) requiring benefits that commence prior to a Normal Retirement Date to be actuarially reduced:

---

[2]    Amendment No. 2 to the 1987 Plan, adopted in 1996, lowered the Plan's Early Retirement Date from age 60 to age 59 ½.  (Pl. Ex. 6, 1987 Plan Document, Amendment No. 2).

The Retirement Income of a terminated Participant determined pursuant to this Section shall be payable commencing as of his Normal Retirement Date, as set forth in Article VI of the Plan, in an amount equal to the nonforfeitable percentage of his Accrued Benefit. A terminated Participant may elect, by giving at least 120 days' prior written notice to the Committee, to have his Retirement Income commence prior to his Normal Retirement Date on the first day of any month coincident with or following his age fifty-nine and one-half birthday. In that event he shall be entitled to receive a Retirement Income for life in an amount equal to his Retirement Income on his Normal Retirement Date, actuarially reduced to reflect the earlier starting date thereof.

(Pl. Ex. 7, 1995 Plan Document, § 5.4(c); Pl. Ex. 8, 2002 Plan Document, § 5.4(c)). However, the 1995 Plan Document explicitly stated that "[e]mployees who retire on a Retirement Date or who terminated employment with the Company prior to January 1, 1995 shall have all of their benefits determined in accordance with the applicable provisions of the Prior Plan . . ." (Pl. Ex. 7, 1995 Plan Document). Similarly, the 1987 Plan Document provided that "[i]n the event an amendment, including any change in actuarial assumptions, causes a Participant's Accrued Benefit to decrease, either directly or indirectly, then such Participant's Accrued Benefit shall be computed without consideration of the amendment or changed actuarial assumption." (Pl. Ex. 6, 1987 Plan Document). From 2002 through 2005, United Refining continued to pay unreduced benefits to terminated vested participants. (Pl. Ex. 20, IRS Submission; Pl. Ex. 21, IRS Submission).

On August 17, 2005, United Refining sent a letter to Eldridge purporting to "clarify when you can receive your pension from United Refining Company and under what terms . . .". (Pl. Ex. 43, 8/17/05 Eldridge Letter). That letter informed her that: "If you elect to receive your pension benefit before age 65, the amount you receive will be adjusted to reflect the earlier starting date." (Pl. Ex. 43, 8/17/05 Eldridge Letter). Substantively identical letters were sent to other terminated vested participants who, like Eldridge, had accrued a vested benefit but had not yet commenced benefit payments. (Pl. Ex. 44). The letters each contained a chart outlining the actuarial factors by which each terminated vested participants' benefits would be reduced. (Id.) Attached to each letter was a copy of Section 5.4 from the 2002 Plan Document. (Id.)

Shortly thereafter, on November 28, 2005, United Refining applied for a compliance statement under the IRS's Voluntary Correction Program ("VCP"). (Pl. Ex. 20, IRS Submission). In its application, United Refining represented that it was voluntarily entering the VCP "for the purpose of correcting plan operational failures that have been discovered as a result of a review of the operation of the Plan." (Id.) United Refining described the purported operational failure to the IRS as follows:

> Under the terms of the Plan, a Participant is entitled to a pension benefit beginning at his or her Normal Retirement Date at age sixty-five years (see Plan sections 1.15 and 5.1). A Participant who terminates his or her employment for any reason other than death, prior to reaching his or her Normal

9

Retirement Date or Early Retirement Date (at age 59-1/2 years) and who has five (5) or more Years of Service shall be entitled to a deferred vested pension benefit beginning at his or her Normal Retirement Date (see Plan section 5.4). If the Participant elects to begin payment of his or her pension benefit on or after attaining age 59-1/2 years but prior to the Normal Retirement Date, then the pension benefit will be actuarially reduced for the earlier payment date (see Plan Section 5.4(c), last sentence)

Beginning with Plan Year 1995 (one participant) and continuing to the current year 2005, 16 Participants who elected to receive their deferred vested benefit prior to attaining their Normal Retirement Date were overpaid a monthly pension benefit that should have been actuarially reduced (as required by the Plan document) to reflect the earlier payment date.

As a result, "excess amounts" were paid to terminated vested participants. This error was discovered in the current year by the Plan's actuaries, Towers Perrin.

(Pl. Ex. 20, IRS Submission). In support of its application, United Refining referenced and attached sections of the 2002 Plan Document, including Section 5.4(c), which did not appear in previous Plan Documents. (Pl. Ex. 20, IRS Submission). Based on these submissions, the IRS issued a compliance statement on March 16, 2006, which authorized United Refining to recoup past payments from, and reduce or halt future payments to, the sixteen plan participants identified in the IRS submission, including Cottillion. (Pl. Ex. 21, IRS Submission, Ex. C; Pl. Ex. 45, Compliance Statement).

After receiving the March 16, 2006 Compliance Statement from the IRS, United Refining sent a letter to those terminated vested participants who were then receiving benefits payments from the Plan informing them that their pensions had been incorrectly calculated. (Pl. Ex. 46, 6/15/06 Letter to Cottillion; Pl. Ex. 48, Letters to Participants). Specifically, the letters advised participants that "the Retirement Committee of the Plan [recently] discovered that the calculation of your monthly pension benefit was incorrect and was in excess of the amount permitted under the terms of the Plan." (Pl. Ex. 46, 6/15/06 Letter to Cottillion; Pl. Ex. 48, Letters to Participants). The letters further stated that:

> The Plan document requires that all pension benefits paid to terminated vested participants PRIOR to their Normal Retirement Age of 65 years MUST be actuarially reduced to the earlier payment date. As your monthly pension benefit began before your 65th birthday, your monthly pension benefit should have been reduced to reflect the earlier payment date.
>
> The Employee Retirement Income Security Act ("ERISA") requires the Retirement Committee to strictly follow the terms of the Plan document in order for the Plan to maintain its favorable qualification issued by the Internal Revenue Service. As your current monthly pension benefit would be reduced under the requirements of the Plan document, the Plan Retirement Committee requested that the Internal Revenue Service review your retirement benefit payments and issue a Compliance Statement permitting correction to your future monthly pension payments.
>
> On March 16, 2006, the Internal Revenue Service issued their Compliance Statement that will permit the Plan to maintain its favorable Plan qualification provided the Retirement Committee corrects your monthly pension benefit

> payments (see Attached Internal Revenue Service Compliance Statement and Submission).

(Pl. Ex. 46, 6/15/06 Letter to Cottillion; Pl. Ex. 48, Letters to Participants).  Each letter further advised the participant as to the new amount of his or her future monthly benefits payments.  Cottillion's letter, for example, stated that:

> Beginning on July 31, 2006 your monthly pension benefit payment will stop and you will not receive any future payments.  Additionally, in order to recover excess payments, you should repay the Plan $14,475.55.  This amount will fully satisfy the amount owed to the Plan for past overpayments and has been reduced to account for any future payments you would have received if excess payments were not paid to you.

(Pl. Ex. 46, 6/15/06 Letter to Cottillion).  Each letter concluded by cautioning that "[t]his determination is based on the Internal Revenue Service's published revenue procedures and Compliance Statement which the Plan Retirement Committee must follow."  (Pl. Ex. 46, 6/15/06 Letter to Cottillion; Pl. Ex. 48, Letters to Participants).

## II.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an

opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A material fact is a fact whose resolution will affect the outcome of the case under applicable law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986); <u>Country Floors, Inc. v. Partnership Composed of Gepner and Ford,</u> 930 F.2d 1056, 1061 (3rd Cir. 1990).  Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'"  <u>Schoch v. First Fidelity Bancorporation</u>, 912 F.2d 654, 657 (3rd Cir. 1990) (quoting <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871 (1990)).  The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial.  <u>Matsushita Elec. Indus. Company v. Zenith Radio Corp</u>., 475 U.S. 574 (1986); <u>Williams v. Borough of West Chester, Pa.</u>, 891 F.2d 458, 460-461 (3rd Cir. 1989) (the non-movant must present affirmative evidence - more than a scintilla but less than a

preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment).

## III. <u>Analysis</u>

Although Plaintiffs raise multiple claims for relief in their Amended Complaint, the heart of this action is Plaintiffs' contention that United Refining violated ERISA's anti-cutback provisions by attempting to retroactively reduce the amount of accrued early retirement benefits earned and/or paid to plan participants under the 1980 and 1987 Plan Documents. Defendants contend that the payment of unreduced benefits from 1988 through 2006 was the result of a mistake made by the plan administrator which has now been properly corrected.

Although ERISA "neither mandates the creation of pension plans nor in general dictates the benefits a plan must afford," <u>Bellas v. CBS, Inc</u>., 221 F.3d 517, 522 (3rd Cir. 2000), ERISA does "seek to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits." <u>Lockheed Corp. v. Spink</u>, 517 U.S. 882, 887 (1996) (quoting <u>Nachman Corp. v. Pension Benefit Guaranty Corp</u>., 446 U.S. 359, 375 (1980)). Indeed, "[t]here is no doubt about the centrality of ERISA's object of protecting employees' justified expectations of receiving the benefits their employers promise them." <u>Central Laborers' Pension Fund v. Heinz</u>, 541 U.S. 739, 743 (2004). A "crucial" component of this objective is ERISA's anti-cutback rule, which provides that

"[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan . . .". <u>Heinz</u>, 541 U.S. at 743-44 (quoting ERISA § 204(g), 29 U.S.C. § 1054(g)(1)).  ERISA Section 204(g)(2) adds that "a plan amendment which has the effect of . . . eliminating or reducing an early retirement benefit . . . with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits."  29 U.S.C. § 1054(g)(2).  Thus, in order to state a claim for a violation of ERISA's anti-cutback rule, a plaintiff must show "(1) that a plan was amended and (2) that the amendment decreased an accrued benefit."  <u>Battoni v. IBEW Local Union No. 102 Employee Pension Plan</u>, 594 F.3d 230, 233 (3rd Cir. 2010).

In the Third Circuit, "what constitutes an 'amendment' to a pension plan has been construed broadly to protect pension benefits." <u>Battoni</u>, 594 F.3d at 234 (citing <u>Hein v. FDIC</u>, 88 F.3d 210, 216) (3rd Cir. 1996).  This construction extends both to explicit amendments, such as a formal adoption of a new provision, and to implicit amendments, such as when "[a]n erroneous interpretation of a plan provision . . . results in the improper denial of benefits to a plan participant." <u>Hein</u>, 88 F.3d at 216.  Thus, a pension committee's reinterpretation of a plan term to deny previously accrued benefits represents an "amendment" of the plan to the same extent as a formal amendment. <u>Id</u>. at 216-17 ("[I]f McNeil improperly denied Hein unreduced early retirement benefits, McNeil's action could be construed as a Plan amendment, and ERISA § 204(g)

would apply."); <u>Hammond v. Alcoa, Inc</u>., 2008 WL 5135671, *8 (W.D. Pa. 2008) ("[A]n amendment can take the form of a change in the actual text of the plan itself, or an erroneous interpretation of a plan provision, resulting in the improper denial of benefits."); <u>Zebrowski v. Evonik Degussa Corp. Admin. Committee</u>, 2012 WL 3962670, *12 (E.D. Pa. 2012) (holding that a "Committee's interpretation had the same effect as a formal amendment" for purposes of an anti-cutback claim); <u>Pieseski v. Northrop Grumman Corp</u>., 2002 WL 97749, *6-7 (citing <u>Hein</u> and holding that the defendants' misinterpretation of a plan provision was "sufficient to constitute an 'amendment' of the Northrop Plan for purposes of a Section 204(g) violation of ERISA . . ."); <u>Hunter v. Caliber System, Inc</u>., 220 F.3d 702, 712 (6th Cir. 2000) (accord).

As previously noted, Cottillion's employment terminated in 1989 under the 1980 Plan Document, and Eldridge's employment terminated in 1996, under the 1987 Plan Document. Plaintiffs' anti-cutback claim is premised on the contention that United Refining retroactively applied Section 5.4(c) of the 1995 and 2002 Plan Documents to reduce Plaintiffs' vested benefits which accrued under the 1980 and 1987 Plan Documents. Defendants counter that Section 5.4(c) did not alter or change the benefits provided under the 1980 and 1987 Plan Documents, but merely stated in explicit terms what already should have been clear under each of the previous documents, to wit, that Plaintiffs' early retirement benefits must be actuarially reduced. Consequently, the company contends that the

Retirement Committee's decision to retroactively reduce pension benefits which had previously been paid at unreduced amounts was not occasioned by the addition of Section 5.4(c), but rather, was an overdue correction of a long-standing mistake. See, e.g., Defendants' Memorandum in Support of Summary Judgment, pp. 13-15.

We first observe, consistent with Hein, Hammond, Zebrowski and Pieseski, discussed above, that whether by virtue of the addition of Section 5.4(c) to the 2002 Plan Document or in light of the Retirement Committee's reinterpretation of the 1980 and 1987 Plan Documents to preclude unreduced early retirement benefits, there has clearly been a "plan amendment" within the meaning of the anti-cutback rule. Having reached that conclusion, our inquiry shifts to whether the benefit claimed by the plan participants and reduced by the amendment was an "accrued benefit."

This analysis is governed by several well-established principles. First, ERISA defines an "accrued benefit" as "the individual's accrued benefit determined under the plan . . .". 29 U.S.C. § 1002(23)(A). In other words, a determination as to an entitlement to benefits must be "based on a permissible reading of the terms of the Plan" before it can be considered an "accrued benefit" within the meaning of ERISA. Redd v. Brotherhood of the Maintenance of Way Employes Division Pension Plan, 2010 WL 1286653, *9 (E.D. Mich. 2010) ("It surely is not enough . . . to merely claim that a pension benefit was 'determined

under the plan' . . . without any effort to show that this benefit determination rested upon some tenable reading of the controlling plan documents."); <u>Hein</u>, 88 F.3d 210, 217 (observing that "ERISA § 204(g) can protect an entitlement to benefits, but it cannot create an entitlement to benefits when no entitlement exists under the terms of the Plan.").

Secondly, it is well-settled that "the proper standard of review" of a plan administrator's interpretation of plan language "depends on the language of the instrument." <u>Conkright v. Frommert</u>, 559 U.S. 506, 130 S.Ct. 1640, 1646 (2010) (citing <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101, 111-12 (1989)). If the plan documents "give the trustee 'power to construe disputed or doubtful terms, . . . the trustee's interpretation will not be disturbed if reasonable.'" <u>Id</u>. at 1646 (quoting <u>Firestone</u>, 489 U.S. at 111). Consequently, a plan administrator's interpretation of a plan "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan" in which case it is subject to "arbitrary and capricious" review. <u>Id</u>. (quoting <u>Firestone</u>, 489 U.S. at 115); <u>see</u> <u>also</u> <u>Hunter</u>, 220 F.3d at 709-12.

Finally, the parties agree that the calculation and payment of monthly benefits by a plan administrator represents an interpretation of the relevant Plan language. <u>See</u> Transcript, Oral Hearing, 11/16/12, p.9; <u>Morales v. Reliance Standard Ins. Co</u>., 2006 WL 2709376, *3 (E.D. Pa. 2006) ("When Reliance

calculated the long term disability monthly benefit it was interpreting relevant portions of the plan.").

Here, each of the Plan Documents at issue explicitly invested the Retirement Committee with the power to "[c]onstrue and interpret the Plan, decide all questions of eligibility and determine the amount, time and manner of payment of any benefits hereunder . . .".  See, e.g., Pl. Ex. 4, 1980 Plan Document, § 13.10(a)(4).  From approximately 1995 through 2002, the Retirement Committee and the plan administrator consistently interpreted the relevant language of the 1980 and 1987 Plan Documents to provide unreduced early retirement benefits to terminated vested participants.  In resolving the question as to whether the provision of unreduced early retirement benefits to terminated vested participants represented an "accrued benefit" for purposes of Plaintiffs' anti-cutback claim, we find the analytical approach utilized by the court in Redd to be persuasive and sound.

In Redd, the defendant pension plan had previously included "final vacation pay" in calculating the pension benefits of plan participants.  From 2001 through roughly 2007, the company paid benefits to plan participants in accordance with this interpretation of the Plan.  On June 20, 2007, however, participants began receiving letters informing them that "errors had been made in the calculation of their pension benefits, and that the Plan was required under federal law to recoup any past overpayments as a result of these errors."  Id. at

*4. Consequently, the Plan advised participants that "their monthly pension payments were being reduced to reflect the purportedly correct calculation of their benefits under the Plan, and that additional amounts were being withheld from their monthly payments to recoup the alleged overpayments they had received in the past." Id. The participants filed suit alleging that this "correction" violated ERISA's anti-cutback rules. Id.

The court began its analysis as to whether the benefits at issue were "accrued benefits" by observing:

> It surely is not enough, after all, to merely claim that pension benefit was "determined under the plan," 29 U.S.C. § 1002(23)(A), without any effort to show that this benefit determination rested upon some tenable reading of the controlling plan documents. . . . [A] wholly mistaken benefit determination presumably would not produce an "accrued benefit determined under the plan," 29 U.S.C. § 1002(23)(A), and thus might not be entitled to protection under ERISA's anti-cutback provision. [Courts have] recognized precisely this principle, rejecting anti-cutback claims where the plaintiff plan participants could not establish an entitlement to benefits under the pertinent pre-retirement plan provisions to a level or type of pension benefits that subsequently was reduced or eliminated.

Id. at *9 (collecting cases). The court further explained:

> Consequently, to secure an award of summary judgment in their favor on their anti-cutback claim, Plaintiffs must establish that the benefit amounts they were receiving prior to the Defendant Brotherhood's June 2007 recalculation and reduction of those benefits were based on a permissible reading of the terms of the Plan. Under the Sixth Circuit's decision in Hunter, 220 F.3d at 709-12, the Brotherhood's interpretation of the Plan at the time of Plaintiffs' retirement

20

(from 2001 until 2006) is subject to "arbitrary and capricious" review, provided that the Plan confers upon the Brotherhood the discretion to construe its terms. The Plan clearly does so[.] . . .

In order to determine, then, whether Plaintiffs' initial retirement benefits, before their recalculation and reduction, were "accrued benefits" that were permissibly "determined under the plan," 29 U.S.C. § 1002(23)(A), the Court must consider whether the interpretation of the Plan that generated these initial benefit awards passes muster under the "arbitrary and capricious" standard of review. This is the "least demanding form of judicial review," under which this Court must uphold a denial of benefits if it is "rational in light of the plan's provisions." "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."

Id. at *10 (internal citations omitted).

Applying the aforementioned principles, the court rejected the defendant's contention that their prior, long-standing interpretation of the plan to include final vacation pay as "compensation" was based on a "loophole" that was never "the intent of the Plan." Id. Rather, after reviewing the plain language of the plan and "the Brotherhood's construction of other Plan terms at the time", the court concluded that the prior interpretation of the plan "readily passe[d] muster under the 'arbitrary and capricious' standard of review." Id. at **11-12. Consequently, the court awarded summary judgment in favor of the plaintiffs on their anti-cutback claim. Id. at *12.

A similar argument was addressed in DiCioccio v. Duquesne Light Co., 911 F.Supp. 880 (W.D. Pa. 1995). Under the facts in DiCioccio, prior to 1990,

the defendant company had consistently included income from the plaintiffs'
exercise of stock options when calculating plaintiffs' benefits under the
company's retirement plan.  In June of 1990, however, the plan administrator for
the company's retirement plan issued a memorandum opining that this income
did not qualify as "compensation" under the plan and would no longer be used in
future benefits calculations.  Id. at 887, 890-91.  Plaintiffs argued that this
reinterpretation of the plan reduced their accrued benefits in violation of ERISA's
anti-cutback rule, with Defendants countering that the plan administrator's
decision "constituted an exercise of appropriate discretionary authority under the
Plans and simply was intended to correct a mistake in practice which had
inadvertently developed."  Id. at 895.  The district court framed its analysis by
noting:

> ERISA defines an accrued benefit in the case of a defined
> benefit plan as "the individual's accrued benefit determined
> under the plan, and, except as provided in section 1054(c)(3)
> of this Title, expressed in the form of an annual benefit
> commencing at normal retirement age...." 29 U.S.C. §
> 1002(23)(A). ERISA further provides that "the accrued
> benefit of a participant under a plan may not be decreased
> by an amendment of the plan, other than an amendment
> described in section 1082(c)(8) or 1441 of this Title." 29
> U.S.C. § 1054(g)(1). It follows *a fortiorari* that an accrued
> benefit may not be retroactively decreased through the
> purported exercise of an administrator's discretion.

Id. at 897.  After reviewing the plan documents, the court determined that the
plan administrator's prior interpretation of the plan to include proceeds from the

exercise of stock options as "income" was based on a reasonable construction of the plan and, as such, had produced an accrued benefit. Id. at 897. Accordingly, the court concluded that the plan administrator's attempt to reinterpret the plan to exclude that income ran afoul of the anti-cutback rule and awarded summary judgment in favor of the plaintiffs. Id.

Based on Redd and DiCioccio, we conclude that it is the Plaintiffs' burden to establish that the interpretation of the Plan Documents which had resulted in the provision of unreduced early retirement benefits for terminated vested participants was tenable and rational such that it passes muster under the arbitrary and capricious standard.[3]  Here, Plaintiffs contend that the Plan Administrator's interpretation of the 1980 and 1987 Plan Documents was correct or, at the very least, was not arbitrary and capricious.  In support of their contention, Plaintiffs primarily rely upon the cross-reference to Section 5.03 contained in Section 7.02 of each of the applicable Plan Documents.  As noted above, Section 7.02 of the 1980 Plan Document provided that "[t]he amount and time of commencement of a deferred vested Retirement Income to a participant who satisfies the requirements of Section 7.01 shall be determined in accordance

---

[3]  Contrary to Defendants' assertions, the focus of our inquiry in the anti-cutback context is not whether the amendment itself was an appropriate exercise of discretion, but whether the amendment has the effect of reducing or eliminating an accrued benefit.  Consequently, Defendants' argument that the Court should apply a deferential standard to the Plan Administrator's "re-interpretation" of the Plan Documents is simply inapposite.  If the prior, long-standing interpretation by the Plan Administrator was sufficiently reasonable to produce an accrued benefit, then the anti-cutback rule prevents the subsequent amendment of the Plan Documents to eliminate that benefit.

with the provisions of Section 5.03, based on the Participant's Benefit Service and Average Compensation at the time of employment termination." (Pl. Ex. 4, 1980 Plan Document, § 7.02). Section 7.02 of the 1987 Plan Document similarly stated that "[t]he amount of a deferred vested Retirement Income to a Participant who satisfies the requirements of Section 7.01 shall be determined in accordance with Section 5.03, based on the Participant's Benefit Service and Average Compensation at the time of employment termination . . . as though such terminated Participant had remained in the employment of the Company until reaching his Normal Retirement Date." (Pl. Ex. 6, 1987 Plan Document, § 7.02). Following the adoption of Amendment No. 5 to the 1980 Plan Document, Section 5.03 of both the 1980 and 1987 Plan Documents stated that "A Participant who retires on an Early Retirement Date will receive his Accrued Retirement Income computed as of his Early Retirement Date commencing at the end of the month in which his Early Retirement Date occurs." Plaintiffs contend that the Plan Administrator reasonably interpreted this language to mean that the amount of a terminated vested participant's deferred vested retirement income would be the unreduced amount specified in Section 5.03, precisely as the plain language of those provisions would seem to suggest.

Defendants' respond that the Plan Administrator's original interpretation of the 1980 and 1987 Plan Documents was the result of a mistake and its decision to rectify it must be accorded deference. Consequently, Defendants

contend, for purposes of Plaintiffs' anti-cutback claim, that Plaintiffs' entitlement to unreduced early retirement benefits never accrued. Defendants dismiss Section 7.02's explicit cross-reference to Section 5.03 as "a vestigial reference" that "makes no sense," <u>see</u> Transcript, Oral Hearing, 11/16/12, at 42, and offer the following interpretation of the Plan Documents as pertaining to the calculation of benefits for terminated vested participants:

> Section 7.02's cross-reference to § 5.03, which referred to the computation of "Accrued Retirement Income" as of the date at the end of the first month in which a participant could commence pay status, confined payment of a full DVT benefit to age 65. The term "Accrued Retirement Income" used in Section 5.03 also appeared in Section 5.02 of the Plan, which directed that the amount of a Participant's "Accrued Retirement Income" would be computed, "as of any particular date," in accordance with the formula for Normal Retirement in Section 5.01 and "based upon his Benefit Service and Average Compensation determined on that date." Reading the three sections together with Section 7.02, the Accrued Retirement Income of a DVT was to be computed under Section 5.01 only at the normal retirement age of 65 as of the last day of the first month in which a DVT could commence pay status by means of the formula in Section 5.01.

(Defendants' Memorandum in Support of Summary Judgment, p. 11).

We find that the Defendants' construction of the Plan Documents unreasonably minimizes the explicit reference to Section 5.03 contained in Section 7.02 in favor of a series of implicit cross-references, the cumulative effect of which would render Section 7.02 meaningless. Moreover, to the extent that the language of the Plan Documents is ambiguous or susceptible to multiple

interpretations,[4] including that offered by the Defendants, the Plan Administrator's long-standing interpretation of those provisions (which provided for unreduced benefits) is entitled to deference, as previously discussed. <u>Reed</u>, 2010 WL 1286653, *10; <u>Hunter</u>, 220 F.3d at 709-12.

In sum, after carefully reviewing the language of the 1980 and 1987 Plan Documents, we conclude that the construction urged by the Plaintiffs is, at a minimum, tenable and rational so as to withstand scrutiny under the arbitrary and capricious standard. Consequently, Defendants' attempt to reduce Plaintiffs' accrued retirement benefits runs afoul of ERISA's anti-cutback rules.

Before summary judgment can be entered in favor of Plaintiffs on their anti-cutback claim, however, two additional hurdles must be cleared. Specifically, Defendants contend that Plaintiffs' claims are barred because they failed to exhaust their administrative remedies and because their claims are untimely. Each of these arguments will be addressed in turn.

As an initial matter, we conclude that Plaintiffs' anti-cutback claim is timely. The parties agree that the appropriate limitations period for an anti-cutback claim is Pennsylvania's six-year "catch-all" limitations period as set forth in 42 Pa.C.S.A. § 5527. <u>See</u>, <u>e.g.</u>, <u>Romero v. Allstate Corp</u>., 404 F.3d 212, 220 (3rd Cir. 2005). Such a claim accrues at "such time as the employee knew or

---

[4] At oral argument, defense counsel conceded that the 1980 and 1987 Plan Documents "were not models of clarity." (Transcript, Oral Hearing, 11/16/12, p. 11).

should have known that the amendment has brought about a clear repudiation of certain rights that the employee believed he or she had under the plan." Id. at 223.

Defendants contend that Plaintiffs' anti-cutback claim accrued, at the latest, on January 30, 2002, when United Refining adopted the 1995 Plan Document which first contained Section 5.4(c). Defendants suggest that Plaintiffs should have known as of that date that their benefits were going to be actuarially reduced. However, in Romero, the Third Circuit rejected a rule which would necessarily "tie the date of accrual to the date of amendment." Romero, 404 F.3d at 223. As explained by the Court:

> A rule that unwaveringly ties the date of accrual to the date of amendment would have the undesirable effect of requiring plan participants and beneficiaries "likely unfamiliar with the intricacies of pension plan formulas and the technical requirements of ERISA, to become watchdogs over potential [p]lan errors and abuses." It would also tend to preclude claims by those who commenced employment after the limitations period applicable to the particular ERISA claim has elapsed. Additionally, it would impose an unfair duty of clairvoyance on employees, such as those in this case, who allege that an amendment's detrimental effect on them was triggered not at the time of its adoption, but rather at some later time by a subsequent event. We eschew such a rule in light of the underlying purposes of ERISA and its disclosure requirements.

Id. at 224 (citing DeVito v. Pension Plan of Local 819 I.B.T. Pension Fund, 975 F.Supp. 258, 265 (S.D.N.Y. 1997); In re Unisys Corp. Retiree Med. Ben. ERISA Litigation, 58 F.3d 896, 901 (3rd Cir.1995)).

In the instant case, no "clear repudiation" of Plaintiffs' accrued right to benefits occurred until Plaintiffs received letters from Loughlin informing them that their vested benefits would be actuarially reduced from that point forward. For Eldridge, that date was August 17, 2005; for Cottillion, June 15, 2006. In light of the communications that Cottillion and Eldridge had previously received from United Refining consistently informing them of their eligibility for an unreduced early retirement benefit (and, in the case of Cottillion, the unreduced payments that he had been receiving for several years), it would likewise impose "an unfair duty of clairvoyance" on Plaintiffs to require them to have predicted that Defendants would someday attempt to retroactively apply Section 5.4(c) to reduce those benefits. See Romero, 404 F.3d at 223-24. Consequently, Plaintiffs' anti-cutback claim, filed on June 12, 2009, is timely.

Finally, with respect to exhaustion, it is undisputed that neither Eldridge nor Cottillion invoked or exhausted Plan appellate procedures following their reductions in benefits. Plaintiffs nonetheless contend that the exhaustion requirement should be excused in this case on the grounds of futility. "A plaintiff is excused from exhausting administrative procedures under ERISA if it would be futile to do so." See Harrow, 279 F.3d at 250 (citing Berger v. Edgewater Steel Co., 911 F.2d 911, 916 (3rd Cir. 1990)). In determining whether to excuse exhaustion on futility grounds, courts consider several factors including: "(1) whether plaintiff diligently pursued administrative relief; (2) whether plaintiff acted

reasonably in seeking immediate judicial review under the circumstances; (3) existence of a fixed policy denying benefits; (4) failure of the insurance company to comply with its own internal administrative procedures; and (5) testimony of plan administrators that any administrative appeal was futile."  Harrow, 279 F.3d at 250.

Here, Plaintiffs primarily rely upon the third factor, contending that United Refining responded to each inquiry from a terminated vested participant concerning the reduction in benefits by informing them that the matter was out of their hands and that nothing could be done.  For example, the notification letters sent by Loughlin indicated that the proposed reduction in benefits was required by a third party, the IRS, to whom no appeal or administrative exhaustion was available.  See Pl. Ex. 46, 6/15/06 Letter to Cottillion; Pl. Ex. 48, Letters to Participants ("[T]he Internal Revenue Service . . . will permit the Plan to maintain its favorable Plan qualification provided the Retirement Committee corrects your monthly pension benefit payments.").   Letters sent in response to prompt inquiries from numerous affected plan participants similarly indicated that Defendants had reached a fixed and intractable position with respect to the benefits in question.  See, e.g., Pl. Ex. 62, 11/14/06 Letter from Loughlin ("The error and correction was submitted to the IRS to remove any decision authority from the Plan Administrator and the Company."); Pl. Ex. 67, 9/13/06 Letter from Loughlin ("This correction was mandated by the Internal Revenue Service and

29

not by the Plan Administrator or the Company.").  By portraying the reduction in benefits as a *fait accompli* driven by the IRS, Defendants represented that their own hands were tied and that no grounds for reconsideration were available. See, e.g., Berger, 911 F.2d at 916-17 (excusing exhaustion where evidence showed "that the company had adopted a policy of denying all applications" for benefits); Falcone v. Teamsters Health and Welfare Fund, 489 F.Supp.2d 490, 496 (E.D. Pa. 2007) (excusing exhaustion where evidence indicated that the defendant had taken a "clear and unwavering" stance with regards to the denial of benefits); Olay v. Hearne, 2007 WL 1520094, *12-13 (W.D. Pa. 2007) (excusing exhaustion as the result of a fixed policy).

For the reasons set forth above, we conclude that Plaintiff has demonstrated a "clear and positive showing of futility."  Harrow, 279 F.3d at 249 (quoting Brown v. Cont'l Baking Co., 891 F.Supp. 238, 241 (E.D. Pa. 1995)).

In conclusion, we find that summary judgment in favor of Plaintiff on the anti-cutback claim presented in Count IV of the Amended Complaint is appropriate.  At oral argument, Plaintiffs' counsel acknowledged that Plaintiffs' anti-cutback claim provides a full and complete remedy for the violations alleged in the Amended Complaint:

> The Court:          Isn't this really an anti-cutback case?
>
> Ms. Brett:          Yes.

| The Court: | Don't you get, if you're right, I'm not suggesting you are, but just to try to get the underbrush cleared out here, you get everything that you want under an anti-cutback theory, don't you? |
|---|---|
| Ms. Brett: | Yes. |

(Transcript, Oral Hearing, 11/16/12, p. 55). Consequently, it is unnecessary to address the alternate theories of recovery advanced in the Amended Complaint at this time.[5] See, e.g., Redd, 2010 WL 1286653, *14 ("[I]n light of the Court's conclusion that Plaintiffs are entitled to summary judgment in their favor on their anti-cutback claim, the Court need not address the other theories of recovery advanced in Plaintiff's complaint.").

---

[5] Similarly, in light of their successful advancement of their anti-cutback claim, Plaintiffs' Motion to Strike Expert Reports and Testimony is denied as moot.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOHN COTTILLION, *et al.*, on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

UNITED REFINING COMPANY, *et al.*,

      Defendants.

C.A. No. 09-140 Erie
District Judge McLaughlin

## ORDER

AND NOW, this 8th day of April, 2013, for the reasons set forth in the accompanying MEMORANDOM OPINION,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment is GRANTED IN PART with respect to the anti-cutback claim set forth in Count IV of the Second Amended Complaint, and is otherwise DENIED WITHOUT PREJUDICE. Defendants' Motion for Summary Judgment is DENIED WITH PREJUDICE as to Count IV and is otherwise DENIED WITHOUT PREJUDICE.

JUDGMENT is accordingly entered in favor of Plaintiffs as to Count IV of the Second Amended Complaint.

/s/ Sean J. McLaughlin
United States District Judge

cm:    All parties of record. ____